UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

UNITED STATES OF AMERICA

v.                                                          CRIMINAL ACTION NO. 3:15-cr-98-DPJ-FKB-1

WALTER MABERRY, II

ORDER

Defendant Walter Maberry, II, is charged with being a convicted felon in the possession of a firearm. But he believes the search that produced the gun violated the Fourth Amendment to the United States Constitution, so he now moves to suppress the evidence recovered during the search. His motion was heard during an evidentiary hearing on May 24, 2016, in which Jackson Police Department Detective Anthony Fox was the only witness. After the hearing, the parties were asked for and provided supplemental briefing. Having now considered the full record and legal authority, the Court concludes that Maberry's motion should be granted.

I.      Factual Findings

This criminal case began, as so many do, with a *Terry* stop. *See Terry v. Ohio*, 392 U.S. 1 (1968). On April 8, 2014, Detective Fox, who was in the "learning phase" as a narcotics detective, was working with other narcotics detectives and units of the Jackson Police Department ("JPD"). This joint "Special Operation" focused on the North Jackson community known as "Brown Bottom," due to increased drug activity and shootings in the area. There is no dispute that the community constitutes a high-crime area.

As Detective Fox approached Bishop Street in his unmarked police car, he saw Maberry get into a black SUV with darkly tinted windows. The SUV was parked in a residential driveway facing the road. As Detective Fox pulled onto Bishop Street, Maberry pulled out of the

driveway, but quickly hit his brakes when Fox became visible, put the SUV in reverse, and swerved back into the driveway.  After pausing for a few seconds, Maberry accelerated back onto the road.

Detective Fox described these maneuvers as erratic and reckless, and he also considered them suspicious given the surroundings.  Fox alerted other nearby officers and initiated a stop in front of Maberry's home.  Fox then exited his vehicle and signaled for Maberry to roll down his window because the officer could not see inside due to the heavy tint.  When Maberry complied, Fox could smell the strong odor of marijuana and noticed that Maberry's eyes seemed glazed.  The detective asked for and received Maberry's permission to search the SUV.

Once Maberry exited the vehicle, Fox used a drug-sniffing K-9 named Alpha to search the SUV, producing several positive alerts.  In the driver's area, Fox found small amounts of marijuana.  Alpha also alerted to a bag in the back cargo area that contained $1,000 in one-dollar bills that had been bound into stacks with rubber bands.  Fox testified that the K-9 would not alert to money unless it had come in contact with drugs.  Fox proceeded to arrested Maberry, but according to Fox's report [14-1], Maberry was not read his *Miranda* rights at that time.

After completing the arrest, Fox retrieved the K-9 for what he claimed was another search of the SUV.  But, according to Fox, the K-9 was not on a leash and immediately went to Maberry's front door, where it again alerted.  When Fox approached the front door to collect Alpha, he could smell marijuana emanating from the house.  The dog then ran to a Chevrolet Monte Carlo parked in the driveway and again alerted.  After obtaining a search warrant, officers searched the Monte Carlo and found the firearm that forms the basis of the sole charge against Maberry.

Fox's testimony regarding the home and the car is not consistent with either his report or the "Underlying [F]acts and Circumstances" ("UFC") that supported the warrant he obtained to search the Monte Carlo. In his report, Fox recorded that after finishing the search of the SUV, "I then *walked* K9 Alpha around the outer perimeter of the residence . . . and he gave a positive alert at the front door." Report [14-1] ¶ 5 (emphasis added). The following paragraph in his report states, "I then walked him around two vehicles parked in the driveway," leading to another positive alert. *Id.* ¶ 6. Based on these events and the SUV search, Fox reports "request[ing] a search warrant for the residence and the red Monte Carlo that was parked in the driveway at the location." *Id.*

The UFC for the search warrant on the Monte Carlo provides yet another account. Like Fox's report, it states that when Fox "walk[ed] K-9 Alpha around [Maberry's house] he smelled a strong odor of marijuana coming from this location and K-9 Alpha gave a positive alert odor on this resident [sic]." UFC [21-3] at 1. But unlike Fox's report, the UFC indicates that JPD obtained and executed the search warrant on the house, discovered the drugs, and then allowed the K-9 to sniff the cars, all of which led to a second search warrant the officers requested for the car. The UFC for the search warrant on the Monte Carlo states:

> *After* we executed the [s]earch warrant at [redacted address] the Jackson Police Department recovered a large amount of [c]rack cocaine and a large amount of U.S. currency. Detective Fox walked K-9 Alpha around a 2007 Chevrolet Monte Carlo Tag [redacted] that is sitting in this driveway of [Maberry's house]. K-9 Alpha gave a positive alert [to] odor on the trunk of this vehicle. *With this information in mind*, I, Detective Altrich Harvey, respectfully request that a search warrant be issued for a 2007 Chevrolet Monte Carlo Tag [redacted] that is sitting in the driveway of [redacted].

*Id.* 1–2 (emphasis added).

3

It should be noted that the arrest happened over two years ago and memories can fade. While Fox's report does not seem to have a date, he presumably would have prepared it shortly after the arrest. The UFC, on the other hand, was obviously prepared at the scene and reflects the most contemporaneous evidence of what transpired. Moreover, it is what the officers reported to the court that issued the warrant.

Based on all of this, the Court credits Fox's testimony up until the arrest. But it cannot credit his testimony that the dog found its way—unassisted—to the front door and to the Monte Carlo. The contemporaneous records show that Fox "walked" the dog to both locations. *Id.* Fox's report also seems inaccurate to the extent it suggests JPD obtained the search warrants for the residence and the Monte Carlo at the same time. *See* Report [14-1] at ¶ 6 (stating that based on the positive alerts and other evidence to that point, "I had reasonable suspicion to [ ] believe that there were more illegal items located at this location, and requested a search warrant for the residence and the red Monte Carlo."). This might simply be a matter of imprecise language, but as noted above, the UFC filed in support of the search warrant on the Monte Carlo expressly references the items already discovered when the officers executed the search warrant on the residence. UFC [21-3] at 1–2. Accordingly, the home search must have come before the officers sought a warrant to search the Monte Carlo.

The more difficult question is the timing of the Monte Carlo sniff. Though not clear, Fox's report seems to indicate that it occurred immediately after the sniff at the front door, *see* Report [14-1] at ¶¶ 5–6, and that is what Fox recalled from the witness stand. The UFC at least suggests that it occurred after the home was searched and the drugs were found. *See* UFC [21-3] at 1 ("After we executed the [s]earch warrant at [redacted address] the Jackson Police

Department recovered a large amount of [c]rack cocaine and a large amount of U.S. currency. Detective Fox walked K-9 Alpha around a 2007 Chevrolet Monte Carlo . . . . K-9 Alpha gave a positive alert odor on the trunk of this vehicle."). It is possible that Alpha sniffed both locations before either search warrant was issued. But the Government has not established that, and the Court will credit the facts as reflected in the UFC, which was drafted at the scene and reflects what the officers reported to the issuing court.

II.     Analysis

Maberry contends that the initial stop and subsequent K-9 searches of his home and cars were all unlawful, and that any evidence discovered as a result is subject to the exclusionary rule. There are three key issues under review: (1) whether the initial stop was supported by reasonable suspicion; (2) whether the sniffs at the front door and around the Monte Carlo were lawful; and (3) assuming the first sniff was unlawful, whether the second sniff constitutes fruit from a poisonous tree.

     A.     The Initial Stop

The Fifth Circuit has frequently examined the contours of *Terry v. Ohio* as it relates to traffic stops. 392 U.S. 1, 21 (1968). Under *Terry*, "the legality of police investigatory stops is tested in two parts. Courts first examine whether the officer's action was justified at its inception, and then inquire whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc) (citing *Terry*, 392 U.S. at 19–20).

Maberry concedes the second prong and focuses his argument on the first. That prong is well defined:

> Under the Fourth Amendment, "[p]olice officers may briefly detain individuals on the street, even though there is no probable cause to arrest them, if they have a reasonable suspicion that criminal activity is afoot." Reasonable suspicion exists if there are "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [a detention]."

*Allen v. Cisneros*, 815 F.3d 239, 245 (5th Cir. 2016) (citations omitted) (alterations in original). Significantly, this test is an objective one, based on the totality of the circumstances. *Id.* So the question is whether "the facts available to the officer at the moment of the . . . search" would lead a reasonable officer to believe "that the action taken was appropriate[.]" *United States v. Rideau*, 969 F.2d 1572, 1574 (5th Cir. 1992) (en banc) (quoting *Terry*, 392 U.S. at 22 (internal quotation marks omitted)). This inquiry does not depend on the "officer's state of mind, or his stated justification for his actions." *Id.*

In this case, Fox testified that he stopped Maberry because he was driving erratically and because his actions were suspicious. But the Court is not limited to Fox's stated justifications. *Id.* Instead, we consider the totality of the circumstances. The Brown Bottom neighborhood was a high-crime area subject to a multi-department "Special Operation" to address gun violence and drug trafficking. While on that operation, Detective Fox observed a vehicle with illegally tinted windows pull out of a driveway. When the driver saw Fox, he abruptly stopped in the middle of the road, swerved back into the driveway, and then almost immediately accelerated back into the road.[1]

---

[1] In his motion, Maberry questions the sufficiency of the evidence that his windows were illegally tinted, but Exhibits G-8 [18-7] and D-1 [21] undercut his argument. Maberry has not offered any evidence rebutting the evidence that the tint was too dark, and he was cited for this violation.

While a person's presence in a high-crime area is not alone sufficient to establish reasonable suspicion, it is a factor. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). "Factors germane to a reasonable suspicion analysis include: whether the area where the stop occurred was a high crime area or one 'of expected criminal activity,' . . . whether the individual engaged in 'unprovoked flight upon noticing the police,' . . . and whether the individual looked nervous or made furtive gestures or suspicious movements." *United States v. Ledet*, 385 F. App'x 392, 394 (5th Cir. 2010) (quoting *Wardlow*, 528 U.S. at 124) (also citing *United States v. Watson*, 953 F.2d 895, 897 (5th Cir. 1992)); *accord United States v. Tuggle*, 284 F. App'x 218, 223 (5th Cir. 2008).

At least two Fifth Circuit cases have found reasonable suspicion for an initial stop under analogous circumstances. First, in *Ledet*, the defendant was parked in a "suspicious" way in a dimly lit portion of a high-crime area—the license plate was not visible though the parking lights were on, and no driver could be seen. *Id.* The Fifth Circuit concluded that "[t]hese particular and articulable facts, taken together with rational inferences from those facts, reasonably warranted Officer Richards's 'intrusion,' *i.e.* the shining of the spotlight into the car and asking Ledet to roll down the window." *Id.* (citing *United States v. Michelletti*, 13 F.3d 838, 840 (5th Cir. 1994)). Second, in *Watson*, the defendant was driving in a high-crime area, saw an officer, pulled into a vacant parking lot, turned off his headlights, and then appeared to hide something in his car. 953 F.2d at 897. The court found reasonable suspicion had been established.

While no two cases are identical, the totality of facts in the present case are similar to those in *Ledet* and *Watson*. Detective Fox was operating on more than a hunch when he asked Maberry to stop. Instead, he offered particular and articulable facts, which, when considered in

their totality, would cause a reasonable officer to conclude that reasonable suspicion existed to temporarily detain the driver for questioning. And after that occurred, there is no dispute that criminal conduct became evident when Maberry rolled down his window while reeking of marijuana.

      B.      The Search of the Home and Monte Carlo

The lawful ways in which law enforcement may use drug-sniffing dogs have been well defined. Although dog sniffs are not ordinarily considered a search, *see, e.g.*, *Illinois v. Caballes*, 543 U.S. 405 (2005); *United States v. Place*, 462 U.S. 696 (1983), they can become so when conducted in or around a home. Based in large part on the special protections against unreasonable searches and seizures given to homes under the Fourth Amendment, the Court has held that the use of a drug-sniffing dog in the area "immediately surrounding and associated with the home"—also known as the curtilage—constitutes a search. *Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013).

In *Jardines*, the Court considered an officer's use of a drug-sniffing dog on the front porch of the defendant's home in an attempt to discover evidence of a crime taking place inside. Relying on the heightened privacy expectations within a house and its curtilage, the Court held that the use of a K-9 in this manner, absent an invitation to approach the house, is a search within the meaning of the Fourth Amendment. 133 S. Ct. at 1415. So absent exigent circumstances—which were not present in the instant case—a warrant supported by probable cause is required before using a drug-sniffing dog on a defendant's front porch. Because Fox did not have a warrant to search Maberry's home, Alpha's alert at the front door was an unconstitutional search.

The search of the Monte Carlo, however, took place in Maberry's driveway, and therefore does not necessarily fall under the holding in *Jardines*. Because dog sniffs in areas outside a home and its curtilage are typically not a search, the key question with respect to the legality of this sniff is whether the Monte Carlo was parked within the curtilage of Maberry's home. The factors relevant to determining whether an area is part of the curtilage include: (1) "the proximity of the area claimed to be curtilage to the home," (2) "whether the area is included within an enclosure surrounding the home," (3) "the nature of the uses to which the area is put," and (4) "the steps taken by the resident to protect the area from observation by people passing by." *United States v. Dunn*, 480 U.S. 294, 301 (1987).

The Fifth Circuit recently considered these factors under substantially similar facts in *United States v. Beene*, 818 F.3d 157, 160 (5th Cir. 2016). In that case, the court determined that the defendant's driveway was not part of the home's curtilage, so using a drug-sniffing dog in the vicinity of a vehicle parked in the driveway did not qualify as a search. *Id.* at 4–5. The court observed that the driveway was open to the street, nothing obstructed access to it, and the defendant had not taken any steps to protect it. *Id.* at 4 (citing *United States v. Moffitt*, 233 F. App'x 409, 411 (5th Cir. 2007) (holding that defendant's driveway and front yard were not part of home's curtilage)). Consequently, the driveway was considered an "open field," which is not protected under the Fourth Amendment.

Here, as in *Beene*, the only factor weighing in favor of finding the driveway to be within the curtilage is its proximity to the house. The front yard, including the driveway, was open to the street and was not obstructed by a fence or other barrier. Likewise, Maberry did not take any steps to protect his privacy. Furthermore, the evidence suggests that the driveway was not used

for "intimate activities of the home." *Dunn*, 480 U.S. at 302.  Thus Maberry cannot be said to have the same heightened expectation of privacy in his driveway as he enjoys in his home.  And because Maberry's driveway qualifies as an "open field," the dog sniff of the Monte Carlo did not constitute a search under the Fourth Amendment.

B.  Fruit of the Poisonous Tree

The present indictment does not charge Maberry for the drugs found in his house, focusing instead on the gun found in the Monte Carlo.  So the only remaining question is whether the taint from the front-door search should exclude the subsequently discovered evidence in the car.  The parties were directed to provide supplemental briefing on this issue and have now done so.[2]

"[T]he exclusionary rule prohibits the introduction at trial of all evidence that is derivative of an illegal search, or evidence known as the 'fruit of the poisonous tree.'" *United States v. Hernandez*, 670 F.3d 616, 620–21 (5th Cir. 2012) (quoting *United States v. Singh*, 261 F.3d 530, 535 (5th Cir. 2001) (internal quotation marks omitted)).  "Under the 'fruit of the poisonous tree' doctrine, all evidence derived from the exploitation of an illegal search or seizure must be suppressed, unless the Government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the Fourth Amendment violation."  *United States v. Rivas*, 157 F.3d 364, 368 (5th Cir. 1998).

In the Government's initial response to the Court's request for additional briefing, it makes three main points on the exclusionary rule.  First, it contends that "[t]he police did not

---

[2]There may be other relevant legal issues, but the Court will constrain this order to the ones the parties addressed.

rely on any evidence illegally seized from the house to obtain the separate search warrant for the Monte Carlo." Gov't's Resp. [23] at 4. But the UFC filed in support of the search warrant on the Monte Carlo states,

> *After* we executed the [s]earch warrant at [redacted address] the Jackson Police Department recovered a large amount of [c]rack cocaine and a large amount of U.S. currency. Detective Fox walked K-9 Alpha around a 2007 Chevrolet Monte Carlo [triggering a positive alert]. *With this information in mind*, I . . . respectfully request that a search warrant be issued for [the Monte Carlo].

UFC [21-3] at 1 (emphasis added). JPD expressly used the drugs found during the illegal search to support the warrant for the car.

Second, the Government states that "[t]he police would have discovered the evidence seized from the Monte Carlo under the inevitable discovery doctrine." Gov't's Resp. [23] at 4.

> The inevitable discovery doctrine applies if the Government demonstrates by a preponderance of the evidence that (1) there is a reasonable probability that the contested evidence would have been discovered by lawful means in the absence of police misconduct, and (2) the Government was actively pursuing a substantial alternate line of investigation at the time of the constitutional violation.

*United States v. Zavala*, 541 F.3d 562, 579 (5th Cir. 2008). The Government carries the burden of proving these points with non-speculative evidence. *Nix v. Williams*, 467 U.S. 431, 456 (1984); *see also Hernandez*, 670 F.3d at 623; *United States v. Cherry*, 759 F.2d 1196, 1205 n.10 (5th Cir. 1985).

In the present case, the Government's response mentions the inevitable-discovery doctrine by name, but it never quite analyzes the legal requirements for the exception. Instead, it argues:

> Because the Defendant had been observed in suspicious activity within a short distance of his house, Detective Fox was bound to investigate the driveway, *which led to* the K-9 dog's alert on the Monte Carlo. The dog sniff of the Monte Carlo led to the Detective obtaining the search warrant for the car. The dog sniff

11

>was an independent break in the illegal searching of the house. The search of the Monte Carlo did not flow from any branch of the house and thus the search was not *fruit of the poisonous tree.*

*Id.* at 5 (first emphasis added).

But this argument conflicts with the Government's concession during the hearing that Fox "had no reasonable suspicion that any drugs were in that Monte Carlo" until the dog alerted and the warrant was obtained. The argument is also speculative and fails to adequately address the relevant factors—like an actively pursued "substantial alternative line of investigation." *Zavala*, 541 F.3d at 579. Finally, as discussed in the next paragraphs, the second sniff was related to the first without "a break in the chain of events." *Rivas*, 157 F.3d at 368.

The Government's third argument is that the car was found beyond the curtilage of the property, so the search was permissible. Gov't's Resp. [23] at 5 (citing *Beene*, at 1741). As noted above, the Court agrees that the vehicle was located beyond the curtilage, but the officers' UFC in support of the search warrant for the car indicates that they obtained a warrant for the house, discovered crack cocaine, and then had Alpha sniff the car. All of this occurred before the officers obtained a warrant to search the car, the application for which was based in part on the illegally seized drugs. UFC [21-3] at 1–2.

And even assuming the second sniff occurred before the home was searched, Fox conducted an unconstitutional search of the curtilage which produced evidence that drugs were present on the premises. And with that evidence in hand, he decided to walk the K-9 over to the Monte Carlo with no break in the chain of events. "The central question in applying the exclusionary rule is not whether the evidence would have been discovered 'but for' a

constitutional violation, but rather whether the evidence is derived from exploitation of the illegality." *United States v. Tovar*, 719 F.3d 376, 386 (5th Cir. 2013).  It was.

Maberry essentially tracks these arguments in his response—and makes a few others. But the Government, for the most part, does not challenge his legal analysis in any substantive way.  Instead, it makes a new argument in reply:  "Assuming for argument, the search warrant violated the Fourth Amendment, the Defendant's admissions to Detective Fox purged any early taint."  Gov't's Reply [25] at 3.

As noted previously, Maberry was arrested but not initially given his *Miranda* rights. After the search warrants were obtained, Maberry apparently saw Fox walking toward the Monte Carlo, "called [Fox] to the patrol car . . . and advised that all items inside the Monte Carlo belonged to him."  Report [14-1] ¶ 8.  Concerned that Maberry was not aware of his rights, Fox read them to Maberry and then asked,  "[W]hat did he mean everything in the car was his[?]"  *Id.* ¶ 9.  Maberry apparently advised that cash and a firearm located in the car belonged to him.  *Id.*

The Government likens these facts to those in *Tovar*, where the defendant admitted possession of contraband before receiving his *Miranda* rights and then repeated the admission after.  719 F.3d at 387–88.  The Fifth Circuit neatly summarized the issue:  "Assuming *arguendo* that Tovar's first statements were unlawfully obtained, the central question is whether Tovar's subsequent post-*Miranda* admissions were voluntary—that is, not a product of coercion or duress—and 'sufficiently an act of free will to purge the primary taint.'"  *Id.* at 397 (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)).

Aside from the fact that both Maberry and Tovar made incriminating statements before and after receiving their *Miranda* warnings, the Court fails to see how *Tovar* helps the

13

Government's position.  Significantly, the issue there was whether Tovar's "*statements . . .* to the police were inadmissible fruit of a poisonous tree."  *Tovar*, 719 F.3d at 386 (emphasis added).  The court did not address whether post-*Miranda* statements can purge the taint related to *physical evidence* found during an unlawful search.  Indeed, the search in *Tovar* was deemed lawful.  *See id.*

The Court is aware of the tests applied in *Tovar*, primarily based on *Wong Sun*.  But those tests determine whether verbal evidence is the fruit of the poisonous tree.  *See Wong Sun*, 371 U.S. at 485.  And here, Maberry has not moved to suppress his statements regarding the vehicle search—he moved to suppress what was found.  The Government cites no other cases on this point and has not explained how Maberry's statements might apply to the tests *Tovar* examined.  Accordingly, the Court is reluctant to address issues that may not have been contemplated.

Having said that, the circumstances of the statements indicate that they were connected to the illegal search.  By the time Maberry made his two statements, he was detained, his home had been unlawfully searched, the K-9 had alerted on the Monte Carlo, the officers—citing the drugs found in the home—had applied for and obtained a search warrant for the Monte Carlo, and Fox was on the verge of searching the vehicle.  It seems speculative to believe that Maberry would have volunteered his ownership of contraband in the vehicle had the search not been imminent.

III.     Conclusion

For the reasons stated, the Court concludes that Defendant's motion to suppress should be granted.  All evidence recovered from the residence and the Monte Carlo shall be excluded.

**SO ORDERED AND ADJUDGED** this the 21st day of June, 2016.

s/ *Daniel P. Jordan III*
UNITED STATES DISTRICT JUDGE